UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
SALLY CANTWELL, PAUL CANTWELL, and                            :
SAMUEL ALEXANDER EDWARDS,                                     :  **ORDER AND OPINION**
                                                              :  **REVERSING BOARD OF**
                                    Plaintiff,                :  **IMMIGRATION APPEALS AND**
          -against-                                           :  **DIRECTING IT TO UPHOLD**
                                                              :  **ORDER OF NEW YORK FAMILY**
ERIC HOLDER *et al.*,                                         :  **COURT**
                                    Defendants.               :
                                                              :  12 Civ. 9042 (AKH)
                                                              :
------------------------------------------------------------- X
ALVIN K. HELLERSTEIN, U.S.D.J.:

      Plaintiffs' appeal from an order of the Board of Immigration Appeals ("BIA") refusing to recognize an order of the New York Family Court in Westchester County that conferred adoptive status on plaintiff Samuel Alexander Edwards. I hold, following the decisions of other United States District Courts, that the BIA erred, that it should have given full faith and credit to the decision of the New York Family Court, and I reverse the BIA decision and remand to it for reconsideration of the petition in accordance with this order.

      There are no facts in dispute. Both sides have moved for judgment on the administrative record, the plaintiffs by motion for judgment pursuant to Fed. R. Civ. P. 12(c) and the government by motion for summary judgment pursuant to Fed. R. Civ. P. 56. The district court has jurisdiction to hear an issue arising under the laws of the United States, 28 U.S.C. § 1331, and to right a legal wrong caused by agency action, 5 U.S.C. § 702.

1

I.   *Factual and Procedural Background*

Samuel Alexander Edwards ("Samuel") was born on July 12, 1991, in the United Kingdom ("UK"). His mother was an alcoholic and, when it became evident that she could not take care of him, UK Social Services transferred him to the care of his aunt and uncle, plaintiffs Sally and Paul Cantwell. In 1996, UK Social Services formally determined that Samuel's mother was not fit to take care of him. On July 11, 1996, Sally and Paul accepted a UK Residence Order giving them parental responsibility over Samuel until he reached 16. Throughout, Samuel has been residing with Sally and Paul without interruption.

In 2000, Sally Cantwell was transferred by her employer to the United States, and Paul and Samuel moved with her to Westchester County. In 2002, when Samuel was approximately 11 years old, Samuel's mother suffered liver failure and died. Upon the news of Samuel's mother's death, Sally and Paul Cantwell promptly commenced proceedings in the UK to adopt Samuel. However, the matter did not conclude, for the UK Family Court required a social worker from the court to assess Samuel's home in the United States, and lacked willingness, financial capability or jurisdiction to order a worker to visit Samuel's home in the United States. In February 2007, it became evident to the Cantwells that the UK Family Court would not act on their petition to adopt Samuel.

In May 2007, the Cantwells filed an adoption petition in New York Family Court. In April 2008, the Westchester Family Court granted the petition and issued a *nunc pro tunc* adoption order, effective July 11, 2007 (the day before Samuel turned 16). After Sally Cantwell became a citizen in June 2010, she filed a Form I-130 Immigrant Petitioner in July 2010, with the United States Citizenship and Immigration Services ("USCIS") to confer benefits on Samuel to which he would be entitled if recognized as her adopted child under 8 U.S.C. § 1151(b)(2).

2

Concurrently, a Form I-485 Application for Adjustment of Status was filed on behalf of Samuel to acquire permanent resident status.

In October 20, 2011, the New York District Office of USCIS denied the Form I-130 Immigrant Petition. *See* Administrative Record (AR) 18-20. It refused to give effect to the *nunc pro tunc* Adoption Order and denied the petition. The order stated the fact that the order of the family court, although effective before Samuel became 16, was not issued until after he was 16. *Id.* The USCIS decision held that

> "adopted while under the age of 16" [the phrase in the statute] means that the court or other entity must actually have entered the adoption order before the child's 16th birthday. An adoption order that was entered on or after the child's 16th birthday does not meet this requirement, even if the court or other entity makes the order effective as of some date before the 16th birthday. See Matter of Cariaga, 15 I&N Dec. 716 (BIA 1976)...

*Id.* The USCIS went on to find: "It appears that the adoptive parent-child relationship was not created before the beneficiary's 16th birthday as required in the INA Section 101(b)(1)(E)." *Id.* Based on the denial of the Form I-130, the USCIS also denied Samuel's Form I-485 Adjustment of Status Application.

On November 16, 2011, the Cantwells appealed the denial of their petition to the BIA. The BIA order, dated August 6, 2012, affirmed the USCIS decision, also relying upon *Matter of Cariaga*. *See* AR 2-4. The BIA stated that "[a]lthough a state family court judge in New York made the adoption decree effective *nunc pro tunc* as of a date when the beneficiary had not yet reached the age of 16, the Director concluded that the adoptive relationship was not created until the beneficiary had already reached the age of 16." *Id.* However, the record does not reflect any fact finding by the Director, but only reliance on the BIA's prior decision.

3

II.  *Statutory Framework*

    A. *The Immigration and Nationality Act*

The INA provides that a lawful permanent resident or United States citizen may petition to confer "immediate relative status" on his or her child as defined in the immigration laws. 8 U.S.C. § 1154(1)(A). The INA defines "child" for these purposes as an "unmarried person under twenty-one years of age" who is, among other things, a child "adopted while under the age of sixteen years if the child has been in the legal custody of, and has resided with, the adopting parents or parents for at least two years . . ." 8 U.S.C. § 1101(b)(1)(E).

Originally, Congress had not included adopted children because of concern of spurious and fraudulent adoptions. *See* S. Rept. 1515, 81st Cong., 2d Sess. 468. In 1957, Congress amended the statute so that children adopted under the age of fourteen (later changed to sixteen) meeting certain requirements would be considered children for the purposes of the INA. *See* Immigration and Nationality Act of September 11, 1957 (71 Stat. 639). The age restriction was intended to respond to concerns of fraudulent and spurious adoptions by reducing the number of potential adoptions while advancing Congress' desire to keep immigrant families united. *Id.*

III.  *Legal Analysis*

    A. *Is the BIA Decision in Matter of Cariaga Owed Chevron Deference?*

In *Matter of Cariaga*, a child's caretakers since he was the age of two waited until the child's eighteenth birthday before filing a petition for his adoption. An attorney had advised that since petitioner's mother could not be located, the family had to wait until the child was eighteen and could give consent before beginning a court proceeding for his adoption. 15 I&N Dec. at

4

716-17. The state court adoption order, entered when the child was nineteen years of age, was retroactive to a date prior to the child's sixteenth birthday. *Id.*

The BIA, claiming to read the statute "literal[ly]," held that the "act" of the adoption order, and not its effective date, controlled. In a two-page opinion without analysis, the BIA concluded that "despite the retroactive effect given the beneficiary's adoption by the Iowa Court, an adoptive relationship was not created within the meaning of the Immigration and Nationality Act, when the beneficiary was adopted under Iowa law at age nineteen." *Id.* The BIA stated what it recognized as the policies intended by Congress, to keep immigrant families together and to treat immigrant children liberally but also to curb fraudulent adoptions. The BIA, however, did not attempt to reconcile these policies or analyze the facts in relation to the policies. The BIA was satisfied by its "literal" interpretation of the statute. *Id.*

The Government argues that the BIA's decision in the instant dispute follows its precedent in *Matter of Cariaga*, 15 I&N Dec. 716 (BIA 1976), and is entitled to *Chevron* deference. The government's view is incorrect.

The issue in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) was the deference to be given to an agency's interpretation of the Clean Air Act. The Environmental Protection Agency ("EPA"), the agency charged with administration of the Act, construed the term, "stationary source" to allow a plant-wide measurement of pollution, rather than the pollution emitted from a particular unit of the plant. The Supreme Court adopted the agency's interpretation of the statute, ruling that it should be given deference for its choice of reading "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute . . ." *Id.* at 845-46 (internal quotations and citations omitted). The Supreme Court criticized the court of appeals for adopting a "static judicial definition of the

term 'stationary source' when it had decided that Congress, itself, had not commanded that definition." *Id.* at 842. The principle of deference, the Supreme Court held, "involved reconciling conflicting policies and a full understanding of the force of the statutory policy in the given situation . . ." *Id.* at 844 (internal citations and quotations omitted).

Since Congress was not clear as to which of the two possible definitions it favored, an interpretation of the statute should focus on the policies that Congress intended the BIA to harmonize. If, as in this case, there is no hint of fraud nor of spurious purpose, the BIA should inquire as to the order of the competent court, here the New York Family Court: What was its purpose in entering the *nunc pro tunc* order? Was it intended that the *nunc pro tunc* order recognize a de facto adoption status to reflect and preserve the family? A *nunc pro tunc* order may be signed to reflect that papers may have lain on the judge's desk, or court proceedings may have stretched unduly, or other matters of delay may occur. But a *nunc pro tunc* order is effective as of the date provided in the order.

The government argues that I am not free to interpret the statute. The BIA has done so and, the government argues, I am constrained to follow the BIA. However, the BIA's literal reading of the statute is not entitled to deference, for it did not apply any expertise of the Board as a caretaker of the nation's immigration laws. As the Supreme Court held in *Chevron*, the principle of deference directs courts to defer to agencies' resolutions of "conflicting policies," not "static" judicial[-like] interpretations of a statute. *Id.* at 843.

In *Sook Young Hong v. Napolitano*, 772 F. Supp. 2d 1270 (D. Haw. 2011), the district court found that the BIA's complete disregard for Congress' intent to keep bona fide immigrant families together was clear and apparent and that the BIA's decision was not entitled

to *Chevron* deference. Like the district court in *Hong*, I find that the BIA's refusal to recognize the *nunc pro tunc* adoption order is arbitrary and capricious.

In *Hong*, the state court entered the adoptive order three weeks after plaintiff's sixteenth birthday but exercised its discretion to date the order as of the date plaintiff filed the petition for adoption, three months before the child's sixteenth birthday. The BIA refused to recognize the adoption order as valid for the purposes of the INA because it was entered after the child turned sixteen, relying on *Matter of Cariaga*. Much like the instant dispute, the Government argued in *Hong* that *Matter of Cariaga* was entitled to *Chevron* deference. The district court rejected this argument because the phrase "adopted while under the age of sixteen" was not defined in the INA and was ambiguous. *Id.* at 1276-77. The court noted that an agency decision is arbitrary and capricious if it has "entirely failed to consider an important aspect of the problem," here Congress' clear intent to keep bona fide immigrant families united. *Id.* at 1277, quoting *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Furthermore, the court acknowledged that *Chevron* deference does not insulate an agency decision that contravenes Congressional intent and that it must "reject a construction of the statute that is contrary to clear congressional intent or that frustrates the policy that Congress sought to implement." *Id.* (internal citations and quotations omitted). *Chevron*, therefore, provides no obstacle to my consideration of the BIA's decision which I now review.

B.  *Prior Courts' Treatment of Nunc Pro Tunc Orders and Matter of Cariaga*

Federal courts across the country have found that the BIA's failure to legally recognize a *nunc pro tunc* adoption order that gives legal effect to the child's adoption before her sixteenth birthday is arbitrary and capricious because it clearly ignores Congress' intent and purpose of keeping families together. These courts decline to give deference to *Matter of*

7

*Cariaga*. These courts have held that *nunc pro tunc* adoption orders are legitimate and should be recognized. *See, e.g., Hong v. Napolitano*, 772 F. Supp. 2d 1270 (D. Haw. 2011); *Gonzalez-Martinez v. U.S. Dept. of Homeland Security*, 677 F. Supp. 2d 1233 (D. Utah 2009); *Velazquez v. Holder*, No. C. 09-01146, 2009 WL 4723597 (N.D. Cal. Dec. 9, 2009); *Messina v. U.S. Citizenship & Immigration Servs.*, No. Civ.A. 05CV37409, 2006 WL 374564 (E.D. Mich. Feb. 16, 2006). *But see Mathews v. USCIS*, 458 Fed. Appx. 831, 833 (11th Cir. 2012) (unpublished); *Khalil v. Napolitano*, No. 12-3817, 2013 WL 5770499 (D.N.J. Oct. 23, 2013).

The district court's decision in *Gonzalez-Martinez v. U.S. Dept. of Homeland Security*, 677 F. Supp. 2d 1233 (D. Utah 2009) is illuminating. In *Gonzalez-Martinez*, the plaintiff was a Mexican citizen, cared for throughout his life by his aunt. Four years after plaintiff's sixteenth birthday and one year after removal proceedings had commenced against the plaintiff, the state court entered an adoption decree that stated that it had effect "retroactively" such that the plaintiff was adopted before his sixteenth birthday. *Id.* at 1234-35. The BIA declined to give effect to the state court adoption order, relying on *Matter of Cariaga*, with which it was not "factually distinguishable." *Id.* The BIA stated without citing authority other than *Matter of Cariaga*, that "immigration laws relating to adoption do not generally recognize retroactive adoption dates." *Id.*

The district court reversed, holding that the BIA's decision was arbitrary and capricious. The court expressed concern that the BIA failed to give appropriate consideration to "the overriding purpose of Congress in the immigration statutes to 'keep families united,'" and "places undue emphasis on the fear that 'fraudulent adoptions would provide a means of evading the quota restrictions.'" *Id.* at 1237. The district court criticized the BIA for "sweeping aside

8

meritorious, non-fraudulent, *nunc pro tunc* orders which formalizes as of a given date a socially-recognized bona fide family relationship." *Id.*

*Matter of Cariaga*, the district court cautioned, if applied as a "literal black and white rule is entirely too restrictive" because it gives no deference to the full faith and credit provision in 28 U.S.C. § 1738. *Id.* The district court ruled that the Full Faith and Credit statutory mandate, in combination with Congress' legislative intent to keep families together, should be given credence, for when "there is a valid decree, a non-fraudulent, non-spurious decree entered by a state tribunal, as to what in fact existed at a prior date, then its finding, its determination, should be given the credence demanded by the full faith and credit statute . . . the valid non-fraudulent state determinations should be accepted." *Id.* I agree with *Gonzalez-Martinez*.

C. *Samuel's Adoption and the BIA's Decision*

Here, as in *Hong* and in *Gonzalez-Martinez*, there is no suggestion or evidence that the Cantwells' adoption of Samuel was spurious or fraudulent. It is a non-fraudulent, legitimate state court order that simply formalizes and recognizes the existence of a "bona fide family unit, long-observed, in the family and in the community," de facto and de jure. *Gonzalez-Martinez*, 677 F. Supp. 2d at 1237. "Each 'adopted' petitioner should be considered not as subject to a blanket rule, but on an individual basis, with emphasis . . . on the professed policy of Congress of keeping families together when families actually exist." *Id.*; *see also, Hong*, 772 F. Supp. 2d at 1272.

Similarly to the plaintiff in *Gonzalez-Martinez*, "[n]o one disputes that petitioners lived as parent and child at all times relevant to this proceeding. . . Thus, the agency should do no less; it should accept that date, and in doing so, it would then meet the twin purposes of the

9

statute, namely to preclude fraud and more importantly to keep families together. To do otherwise elevates one purpose over the other, and thus does not follow the mandate of Congress to consider both, and it ignores the full faith and credit statute. The action is thus both 'arbitrary and capricious' and contrary to law, 5 U.S.C. § 706(2)(A)." *Gonzalez-Martinez*, 677 F. Supp. 2d at 1238.

Samuel's adoption proceedings were commenced in the UK over four years before Samuel's sixteenth birthday. The UK was then where his adopted status should have been authorized, for it was pursuant to UK law and procedure that the Cantwells became Samuel's parents and Samuel became their child. When the Cantwells were transferred to the United States and decided to become United States citizens, and when the UK court became unable to act, the Cantwells commenced proceedings in New York Family Court several months before Samuel's sixteenth birthday; the court's decree, *nunc pro tunc*, recognized Samuel's long existing adopted status. The BIA's failure to recognize the undisputed facts was arbitrary and capricious.

The BIA's decision is reversed and the case is remanded for further proceedings consistent with this decision. The Clerk shall mark the motions (Doc. Nos. 12 & 14) terminated and the case closed.

SO ORDERED.

Dated: February 6, 2014
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

10